No. 99-608

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 347

STATE OF MONTANA,

Plaintiff and Respondent,

v.

SANDRA WHITE SHOOK,

Defendant and Appellant.

FILED

DEC 3 0 2002

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM: District Court of the Twentieth Judicial District,
In and for the County of Sanders,
The Honorable C. B. McNeil, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Tom D. Tobin; Tobin Law Office, Winner, South Dakota

For Respondent:

Hon. Mike McGrath, Attorney General; Sarah A. Bond,
Assistant Attorney General, Helena, Montana

Robert Zimmerman, Sanders County Attorney, Thompson Falls
Montana

For Amicus Curiae:

John B. Carter, Daniel F. Decker, Tribal Legal Department,
Confederated Salish and Kootenai Tribes, Pablo, Montana
(for Confederated Salish and Kootenai Tribes)

Maylinn Smith, Indian Law Clinic, University of Montana,
Missoula, Montana (for Montana-Wyoming Tribal Judges Association)

Submitted on Briefs: October 4, 2001

Decided: December 30, 2002

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1      Appellant Sandra White Shook (Shook) appeals an order of the Twentieth Judicial District Court, Sanders County, denying her motion to dismiss the charge against her and upholding the Montana Fish, Wildlife and Parks Commission (Commission) regulation prohibiting non-tribal members from hunting big game on all Indian reservations in Montana. We affirm.

¶2      We address the following issues on appeal:

¶3      1. Did the District Court properly conclude that the state's big game hunting closure to non-tribal members on Indian reservations does not violate constitutional guarantees of equal protection?

¶4      2. Did the District Court properly conclude that the state's big game hunting closure to non-tribal members on Indian reservations is not an unlawful exercise of the powers of the Commission?

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶5      On or about November 16, 1997, Shook shot and killed a whitetail buck on private property within the exterior boundaries of the Flathead Indian Reservation.  Under Commission hunting regulations, big game hunting privileges on Indian Reservations are limited to tribal members only, thereby closing the hunting season to non-tribal members. Shook is not a tribal member.  Further, Shook did not own the private property where she hunted, nor was the property owned by a tribal member.  Shook was charged with hunting within a closed area in violation of § 87-1-304, MCA, with the penalty provided in § 87-1-102, MCA.

¶6 Shook pleaded guilty in justice court. However, pursuant to § 46-12-204(3), MCA, she reserved her right to a review of the adverse determination of her initial motion to dismiss. Shook then appealed to the District Court, asserting in her renewed motion to dismiss that the closure to non-tribal members was invalid for several reasons. The parties then stipulated to facts sufficient to establish the offense charged.

¶7 Based on the stipulated facts, the District Court addressed Shook's motion to dismiss and concluded that the regulation limiting big game hunting on reservations to tribal members did not violate the Montana Constitution and was a valid exercise of the powers of the Commission. Shook subsequently pleaded guilty, admitting in open court to killing a whitetail deer on private property within the Flathead Reservation that she did not own, and admitting to knowing that the area was closed under Commission regulations. Shook was sentenced and appealed the District Court's ruling.

¶8 After Shook filed her notice of appeal, Shook and the State stipulated to a motion to vacate the appeal in this Court in order to allow for possible resentencing by the District Court. However, the District Court declined to resentence in an order dated March 12, 2001. As a result, Shook then proceeded with this appeal. We allowed the Confederated Salish and Kootenai Tribes (the Tribes) and the Montana-Wyoming Tribal Judges Association to submit *amici* briefs.

## II. STANDARD OF REVIEW

¶9 In this case, the District Court's order denying Shook's motion to dismiss is based entirely on conclusions of law regarding the legality of the state's big game hunting

3

prohibition for non-tribal members on land within the exterior boundaries of Indian reservations in the state. Accordingly, we review the District Court's conclusions of law to determine whether those conclusions are correct. *Zempel v. Uninsured Employers' Fund* (1997), 282 Mont. 424, 428, 938 P.2d 658, 661. Further, we will affirm the District Court's ruling if the court reached the correct result for the wrong reason. *State v. Parker*, 1998 MT 6, ¶ 20, 287 Mont. 151, ¶ 20, 953 P.2d 692, ¶ 20.

## III. DISCUSSION

¶10 **1. Did the District Court properly conclude that the state's big game hunting closure to non-tribal members on Indian reservations does not violate constitutional guarantees of equal protection?**

¶11 The 1997 Commission regulation at issue here reads: "Big game hunting privileges on Indian Reservations are limited to tribal members only." While a copy of the regulation at issue was not entered into the trial court record by either party, the parties stipulated to this language in the District Court proceedings.[1] This regulation was promulgated pursuant to § 87-1-304(1)(a)(i), MCA, which reads: "The commission may . . . fix seasons, bag limits, possession limits, and season limits." As mentioned, Shook was prosecuted for hunting during a closed season in violation of § 87-1-304, MCA.

---

[1] We note here that the corresponding 2002 regulation is substantially similar. Under the 2002 "Big Game Hunting Regulations, Preparing for Your Hunt, Closed Areas" the corresponding regulation reads:

> Indian Reservations are limited to Tribal members only for big game hunting privileges unless otherwise provided for by agreements between the State of Montana and a Tribal Government.

4

¶12     Shook first asserts that the state's big game hunting closure to non-tribal members on reservations is an unconstitutional violation of equal protection because it distinguishes between tribal members and non-tribal members on the basis of race. The State and the Tribes counter that laws that distinguish between persons based on tribal membership have long been held constitutional under equal protection requirements because the distinction is political rather than racial. The District Court agreed with the State and held that tribal membership was a valid political classification.

¶13     We agree with the State, with the Tribes, and with the District Court. The United States Supreme Court has already explicitly considered whether laws that distinguish based on tribal membership violate equal protection in *Morton v. Mancari* (1974), 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290. In that case, the Court addressed Bureau of Indian Affairs employment preferences for Indians and held that the preferences were not unconstitutional classifications. The Court stated:

> Literally every piece of legislation dealing with Indian tribes and reservations . . . single out for special treatment a constituency of tribal Indians living on or near reservations. If these laws, derived from historical relationships and explicitly designed to help only Indians, were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased and the solemn commitment of the Government toward the Indians would be jeopardized.
>
> . . . .
>
> . . . The preference is not directed towards a "racial" group consisting of "Indians"; instead, it applies only to members of "federally recognized" tribes. This operates to exclude many individuals who are racially to be classified as "Indians." In this sense, the preference is political rather than racial in nature.

5

*Morton*, 417 U.S. at 552-54, 94 S.Ct. at 2483-85. The Court went on to hold that laws that afford Indians special treatment are constitutional as long as those laws can be tied rationally to the fulfillment of the unique federal obligation toward Indians. *Morton*, 417 U.S. at 555, 94 S.Ct. at 2485. *See also United States v. Antelope* (1977), 430 U.S. 641, 647, 97 S.Ct. 1395, 1399, 51 L.Ed.2d 701 (federal criminal code applicable in Indian country does not violate equal protection).

¶14　The State of Montana is required to follow this federal precedent by the express terms of both our own Constitution and the federal enabling act establishing Montana as a state. Specifically, following the Preamble to the Montana Constitution, Article I, the Compact With the United States, requires that the State abide by "the agreement and declaration that all lands owned or held by any Indian or Indian tribes shall remain under the absolute jurisdiction and control of the congress of the United States." *See also* Act of Feb. 22, 1889, 25 Stat. 676. Based on this requirement, we have previously held that Indian treaties are "regarded as a part of the law of the state as much as the state's own laws and Constitution[,] [are] effective and binding on [the] state legislature[] . . . [and are] superior to the reserved powers of the state, including the police power." *State v. McClure* (1954), 127 Mont. 534, 539-40, 268 P.2d 629, 631. *See also State v. Stasso* (1977), 172 Mont. 242, 246, 563 P.2d 562, 564 (treaty provisions "must be considered as a reservation by the Indians, rather than a grant by the federal government").

¶15　Consequently, federal Indian law regarding the rights of Indians is binding on the state. Therefore, the state equal protection guarantee under Article II, Section 4, must allow

6

for state classifications based on tribal membership if those classifications can rationally be tied to the fulfillment of the unique federal, and consequent state, obligation toward Indians. *Cf. Zempel*, 282 Mont. at 430-33, 938 P.2d at 662-64 (failure of state workers' compensation fund to cover workers under tribal jurisdiction does not violate equal protection). Indeed, our own Constitution makes a distinction regarding Indians in Article X, Section 1(2) ("The state recognizes the distinct and unique cultural heritage of the American Indians and is committed in its educational goals to the preservation of their cultural integrity.").

¶16    Therefore, we need only address whether the state regulation that prohibits non-tribal members from hunting big game on Indian reservations is rationally tied to the fulfillment of the unique obligation toward Indians. We hold that it is. There are seven Indian reservations in Montana each established by treaty and agreements with the federal government. The majority of the treaties establishing the reservations reserve some type of hunting or fishing rights to the respective tribes. *See, e.g.*, Treaty with the Flatheads, Etc. of July 16, 1855, 12 Stat. 975 (commonly called the Hellgate Treaty). At the same time, we have already held that the state can regulate the hunting activities of non-tribal members on reservations unless precluded by an act of Congress or tribal self-governance matters. *State ex rel. Nepstad v. Danielson* (1967), 149 Mont. 438, 443, 427 P.2d 689, 692. *See also Montana v. United States* (1981), 450 U.S. 544, 564, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493.

¶17    Accordingly, under Article I, the State, and in this case the Commission, has a duty to regulate hunting by non-tribal members in a way that recognizes the Indian hunting privileges protected by federal law. The regulation at issue here deals with the state's

7

obligation by simply prohibiting hunting by non-tribal members on reservations. This is an entirely rational means to preserve wildlife populations for hunting by Indians. Therefore, the regulation is rationally related to the federal, and consequent state, obligation to recognize tribal hunting privileges.

¶18 Despite the straightforward approach of the regulation, Shook asserts that the regulation is arbitrary because no studies have been done to show if big game wildlife populations on the reservations are over hunted by tribal members. Shook further asserts that conservation purposes could be accomplished by other legitimate means. While there may be other means to conserve the big game wildlife, we simply disagree this invalidates the regulation. When a law is assessed for a rational basis, exact precision or efficiency is not necessary. *See Baldwin v. Fish & Game Comm'n* (1978), 436 U.S. 371, 390, 98 S.Ct. 1852, 1864, 56 L.Ed.2d 354 ("That [Montana] might have furthered its underlying purpose more artfully, more directly, or more completely, does not warrant a conclusion that the method it chose is unconstitutional."); *McClanathan v. Smith* (1980), 186 Mont. 56, 67-68, 606 P.2d 507, 513. As already stated, the regulation at issue here is rationally related to its objective and is therefore constitutionally permissible.

¶19 In addition, we agree with the State that the District Court properly denied Shook's request for an evidentiary hearing regarding her argument that the regulation violated equal protection. Such a hearing was not necessary to decide the issues of law presented by Shook to the trial court and this Court. Further, although Shook alleges in passing that the regulation is not enforced uniformly across the reservations, Shook did not properly preserve

8

this issue for appeal. The general rule is that issues not raised before the trial court and new legal theories are not considered by this Court on appeal because it is unfair to fault the trial court on an issue it was never given an opportunity to consider. *Unified Indus., Inc. v. Easley*, 1998 MT 145, ¶ 15, 289 Mont. 255, ¶ 15, 961 P.2d 100, ¶ 15.

¶20 Finally, we note that while we agree with the *amicus* Montana-Wyoming Tribal Judges Association that the treaties and agreements involving the seven reservations in Montana are each unique, we do not agree that this prevents the state from designing a big game hunting regulation regarding Indian reservations that applies statewide. Indeed, the regulation at issue serves to assure that big game populations on all the reservations are preserved. *See also* 2002 Big Game Hunting Regulations, Preparing for Your Hunt, Closed Areas (regulation provides for agreements specific to each tribe).

¶21 **2. Did the District Court properly conclude that the state's big game hunting closure to non-tribal members on Indian reservations is not an unlawful exercise of the powers of the Commission?**

¶22 Shook next asserts that the regulation is an unauthorized exercise of regulatory power by the Commission because there is no statute directly authorizing the regulation and because there is no corresponding legislative history regarding tribal hunting issues or wildlife conservation on the reservations. Consequently, Shook argues that the regulation exceeds the scope of § 87-1-304(1)(a), MCA. Shook also asserts that the regulation contradicts state law requiring consent of the owner to close their land to hunting. The State and the Tribes assert that the Commission had proper authority to promulgate the regulation and that the Commission was required to recognize the Indian rights protected by federal law in designing

9

its regulations. The State further asserts that the consent laws regarding wildlife refuges are not at issue in this case and that closed seasons apply regardless of land ownership.

¶23 The District Court held that regulating hunting seasons was within the scope of the Commission, that the Commission regulation does not create a refuge, that Shook did not hunt on her own land and therefore could not raise the issue of the consent laws, and that legislative intent expressing that Commission regulations must recognize federal law was unnecessary. Further, the District Court stated that 18 U.S.C. § 1165, gave the Tribes exclusive authority to regulate hunting on the reservation.

¶24 We agree with the District Court, with the exception of its discussion of 18 U.S.C. § 1165 as discussed below.

¶25 Under § 87-1-301(1)(a), MCA, the Commission is charged with setting "policies for the protection, preservation, and propagation of the wildlife . . . of the state and for the fulfillment of all other responsibilities of the department as provided by law." *See also* § 87-1-301(1)(b), MCA. In fulfilling this directive, the Commission must promulgate regulations that are in accordance with general requirements of state law. As mentioned above, Indian treaties are effectively a binding part of state law. Indeed, we have previously held that the state is required to recognize Indian rights despite the fact that those rights are not specifically mentioned. *State ex rel. Greely v. Confederated Salish & Kootenai Tribes* (1985), 219 Mont. 76, 95, 712 P.2d 754, 765-66. In *Greely*, we stated:

> We recognize that the Water Use Act of Montana does not explicitly state that
> the Water Court shall apply federal law in adjudicating Indian reserved rights.
> However, we conclude that is not fatal to the adequacy of the Act on its face.

10

> We hold that state courts are required to follow federal law with regard to those water rights.

*Greely*, 219 Mont. at 95, 712 P.2d at 765-66.

¶26 Because of the supremacy of federal law on matters related to Indian treaties, we have also held that state statutes do not violate equal protection in excluding Indians, even when the exclusion is not specifically mentioned. *Zempel*, 282 Mont. at 430, 938 P.2d at 662 (plaintiff was excluded from state Uninsured Employer's Fund coverage by controlling principles of federal law regarding state jurisdiction over Indian reservations, rather than by the statutory definition itself).

¶27 Therefore, contrary to Shook's assertions, it is not necessary that § 87-1-301, MCA, or § 87-1-304, MCA, specifically mention Indian hunting rights in order for the Commission to have proper authority to promulgate a regulation that recognizes those rights under state law. Similarly, it is not necessary that the Commission be directed by legislative intent, studies, or committee minutes specific to the issue in order to recognize Indian hunting rights. Accordingly, we hold that the District Court properly concluded that the Commission did not exceed its powers in promulgating the regulation closing big game hunting pursuant to its directive to set seasons under § 87-1-304(1)(a), MCA, or § 87-1-301(1), MCA.

¶28 We note in making this holding that in addition to the fact that the Commission must recognize Indian hunting privileges when promulgating regulations, the Commission must also take into account § 87-1-228, MCA, which explicitly recognizes the tribal hunting rights relative to the Flathead Reservation. Further, the Commission must also take into account

11

litigation in Montana's federal District Court regarding the issue of jurisdiction to regulate hunting on the Flathead Reservation. *See Confederated Salish & Kootenai Tribes v. State* (1990), 750 F. Supp. 446, and subsequent Order in CV 90-49-M-CCL (May 8, 1991). This litigation specifically recognized that the issue of jurisdiction to regulate hunting on reservations was extremely complex and best left to resolution by agreement between the State and the Tribe. *See* Order in CV 90-49-M-CCL (May 8, 1991) (staying the proceedings for the duration of the settlement agreement between the State and the Tribe which is still in effect). Therefore, in the case of the Flathead Reservation, the regulation at issue here is specifically required by that agreement.

¶29   In support of her argument, Shook cites cases in which we have found an agency improperly exceeded the scope of an authorizing statute. However, those cases are all distinguishable simply because none involve additional laws that the agency was required to acknowledge in designing the regulation. *See, e.g., Safeway, Inc. v. Montana Petroleum Release Compensation Bd.* (1997), 281 Mont. 189, 931 P.2d 1327 (administrative rule that required that tank be in place when tank release was discovered, added additional requirements to statute that invalidated rule).

¶30   We also agree with the State that the District Court was correct in holding that § 87-1-305, MCA, which allows the Commission to establish wildlife refuges on private land with landowner consent, was not relevant to Shook's case. First, as the District Court stated, the closed season in this case does not create a refuge. Second, contrary to Shook's position, this case does not present the issue of the rights of someone hunting on their own land because

12

it is undisputed that she was not hunting on her own land. Therefore, the District Court correctly held that Shook's conviction under the regulation did not conflict with § 87-1-305, MCA.

¶31 Further, as mentioned, we will affirm the trial court when it reaches the correct result for the wrong reason. In this case, the court cited 18 U.S.C. § 1165,[2] for the proposition that the Tribes have exclusive jurisdiction to regulate hunting on the reservation. However, that statute is inapplicable to the case at bar because Shook was charged in state court with violating § 87-1-304, MCA; she was not charged in federal court with a violation of federal law. Therefore, because the District Court correctly concluded that the regulation does not violate equal protection and correctly concluded that the Commission did not exceed its authority in promulgating the closed season on Indian reservations, we affirm the court's result even though it erred in citing 18 U.S.C. § 1165.

¶32 Finally, Shook asserts on appeal that she waived her right to trial only for the determinations at issue here and that if this Court concludes the District Court properly denied her motion to dismiss, she is still entitled to a trial on the merits. Shook quotes the

---

[2] 18 U.S.C. § 1165, reads:
Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any Indian or Indian tribe, band, or group and either are held by the United States in trust or are subject to a restriction against alienation imposed by the United States, or upon any lands of the United States that are reserved for Indian use, for the purpose of hunting, trapping, or fishing thereon, or for the removal of game, peltries, or fish therefrom, shall be fined under this title or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited.

13

transcript at length in order to demonstrate that she did not waive her right to trial and notes that the stipulated facts approved by the court specifically reserve her right to "litigate the below facts" should she lose the motion to dismiss.

¶33    The State asserts that the issue of whether Shook retained her right to trial is not properly before the Court. We agree. Shook initially pleaded guilty in justice court and pursuant to § 46-17-203(2), MCA, she waived her right to trial on the merits in the District Court. Consequently, the transcript of the proceedings in the District Court regarding this issue is irrelevant. Therefore, Shook is not entitled to a trial on the merits. Further, the record establishes that Shook knowingly pleaded guilty to undisputed facts because she wished to litigate the questions of law regarding the regulation. Finally, she made no motion to withdraw her plea, so the issue was not preserved.

## IV. CONCLUSION

¶34    Because the District Court properly concluded that the Commission regulation closing Indian reservations to big game hunting by non-tribal members was a constitutionally permissible exercise of authority within the statutory powers of the Commission, we affirm.

_____
                                    Justice

We concur:

_____
             Chief Justice

_____

_____

_____
             Justices

14